UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO: _____

MICHAEL D. BAUMANN,

      Plaintiff,

vs.

SENATOR INVESTMENT GROUP, LP

      Defendant.

_____/

## COMPLAINT

      Plaintiff, Michael D. Baumann ("Baumann"), sues Defendant, Senator Investment Group, LP ("Senator"), and alleges:

### INTRODUCTION

      1.     This is an action for damages arising from fraudulent misrepresentations by defendant Senator, and such other relief as this Court deems appropriate, over all of which this Court has jurisdiction.

      2.     The Plaintiff, Baumann, served as CEO and Chairman of the board of directors of the real estate investment trust Trade Street Residential, Inc. ("Trade Street") from its formation on June 1, 2012 until the culmination of Senator's fraud in February 2014—a scheme that, as outlined below, included misrepresentations not only to Baumann but, through certain funds advised by Senator, to the SEC and, by extension, to the existing and prospective shareholders of Trade Street.

      3.     Beginning in the fall of 2013, Senator planned, orchestrated and ultimately

accomplished a takeover of Trade Street.   First, Senator brazenly and falsely represented itself as a "passive investor" to Baumann to obtain a significant ownership interest in Trade Street and limited representation on its board of directors.   Next, Senator violated its prior representations by engineering a reconfiguration of the Trade Street Board and ousting Baumann, numerous directors, and the majority of Trade Street's senior management team.   Senator then cleverly cemented its control by reducing the size of the Trade Street board to ensure that the three directors firmly within Senator's control would always have a controlling majority.

### THE PARTIES

4.     Plaintiff Michael D. Baumann is an individual residing in Hollywood, Florida.  Baumann served as Chief Executive Officer, Founder and Chairman of the Board of Directors of defendant Trade Street from its formation on June 1, 2012 until February 23, 2014.

5.     Defendant Senator Investment Group, LP is a Delaware limited partnership with its principal place of business located at 510 Madison Avenue, 28th Floor, New York, New York 10022.

### JURISDICTION & VENUE

6.     This Court has Jurisdiction over this action pursuant to Title 28, United States Code, Section 1332 because Baumann and Senator are of diverse citizenship, and the amount in controversy exceeds $75,000.00.

7.     Personal jurisdiction exists over defendant Senator pursuant to § 48.193, Fla. Stat., because, among other things, Baumann's causes of action against Senator arise from tortious acts that Senator committed within the state of Florida.

- 2 -

8.      Venue is proper in this judicial district pursuant to Title 28, United States Code, Section 1391 because, among other things,  a substantial part of the events or omissions giving rise to Baumann's claims against Senator occurred within this judicial district, in Miami-Dade County, Florida.

## FACTUAL BACKGROUND

### *Summer 2013: Senator Learns that Trade Street*
### *Is Looking for a Source of Additional Capital*

9.      Trade Street is a real estate investment trust that acquires, owns, operates and manages garden-style and mid-rise apartment communities in mid-sized cities and suburban submarkets of larger cities primarily in the southeastern United States and Texas.  Trade Street's main office and principal place of business are located in Aventura, Florida.  As mentioned above, Baumann served as CEO and Chairman of the Trade Street Board from the date Trade Street was formed, June 1, 2012, until Senator engineered his ouster in February 2014.

10.     In approximately June 2013, Trade Street's management determined that Trade Street needed additional capital.  Accordingly, Trade Street's two most senior executives, Baumann and David Levin, began pursuing discussions with potential capital sources, including, among others, TPG Capital, L.P. ("TPG Capital"). Importantly, Trade Street sought only passive investors, like TPG Capital, because management knew and believed that keeping Trade Street's experienced, proven senior management team intact was vital to Trade Street's long-term success.

11.     Michael Simanovsky, one of Senator's investment analysts, soon learned of Trade Street's search to identify additional capital sources from Nirmal Roy, a friend of Simanovsky's who worked at one of Trade Street's existing investors, BHR Capital,

- 3 -

LLC ("BHR Capital").

12.     Shortly thereafter, Simanovsky, acting for and on behalf of Senator, contacted Trade Street's investor relations consultant to arrange a meeting with Trade Street's management.

13.     On September 16, 2013, Baumann and Levin met with Simanovsky at a real estate conference in Chicago, Illinois.  Encouraged by their initial conversation, Baumann and Simanovsky agreed to arrange a subsequent meeting to discuss a possible transaction between Trade Street and Senator in greater detail.

*October 2013: Senator Misrepresents Its Intentions In Order*
*To Secure Baumann's Support of a Transaction with Senator*

14.     On October 16, 2013, Simanovsky met with Baumann, Levin and other members of Trade Street's management at Trade Street's offices in Aventura, Florida (the "October Florida Meeting").

15.     During the October Florida Meeting, Simanovsky described the core features of Senator's proposal to increase Trade Street's capital.

16.     Specifically, Senator proposed what became known as the "Backstop Transaction," which entailed raising $150 million in capital for Trade Street through a combination of (i) a $100 million rights offering to Trade Street's existing shareholders; (ii) a commitment from certain funds advised by Senator to purchase the unsubscribed portion of that $100 million rights offering, if any; and (iii) a separate, additional purchase by those Senator funds of $50 million of Trade Street common shares.

17.     When Senator presented the Backstop Transaction during the October Florida Meeting, Senator knew that there could not be any transaction between Trade Street and Senator without Baumann's individual support.  Further, Senator knew that

- 4 -

Trade Street was engaged in discussions with other potential capital sources, including TPG Capital.  Thus, Senator knew that it would need to persuade Baumann to choose Senator over the other alternative capital sources.

18.     To persuade Baumann to recommend Senator as Trade Street's source of additional capital and to make the Backstop Transaction more attractive to Baumann, Simanovsky, on behalf of Senator, made a variety of material misrepresentations regarding its proposed role as a "passive investor" in Trade Street (the "Passive Investor Misrepresentations").  Specifically, Simanovsky represented to Baumann, Levin and the other members of Trade Street's management and the Trade Street Board: (i) that Senator is a "passive investor"; (ii) that Senator "backs" existing, experienced management teams; and (iii) that Senator helps "grow good companies that need capital."  Simanovsky further misrepresented that Senator had no intention of changing Trade Street's existing management or otherwise obtaining control, directly or indirectly, over Trade Street.

19.     To further persuade Baumann to support the Backstop Transaction with Senator, Simanovsky made multiple material misrepresentations during the October Florida Meeting relating to Baumann's future role in Trade Street and Senator's support for an executive compensation plan designed to appropriately reward and retain Trade Street's executive officers, including Baumann (the "Personal Misrepresentations").  Specifically, Simanovsky represented to Baumann that Simanovsky and Senator intended:

        a.   to support Baumann in his management role as CEO and Chairman of the Board of Trade Street such that Baumann would have the opportunity to run Trade Street and build Trade Street;

b. to advocate to the Trade Street Board a specific executive bonus compensation plan, which included an appropriate award of a performance bonus to Baumann and other senior executive officers upon completion of the Backstop Transaction;

c. to advocate to the Trade Street Board specific and appropriate increases in annual salaried compensation for senior executive officers, including Baumann, upon completion of the Backstop Transaction;

d. to advocate to the Trade Street Board, issuance of specific and appropriate Long Term Investment Program ("LTIP") stock awards to Bauman and other senior executive officers; and

e. to ensure that Baumann appropriately received *at least* as much incentive and performance-based compensation in the coming years as he had over the preceding 12 months, including a $350,000 performance bonus and an LTIP award of 54,338 shares of restricted Trade Street common stock.

20.     At the time Simanovsky made the Passive Investor Misrepresentations and the Personal Misrepresentations, he and Senator knew that the representations were not true.    In fact, at the time Simanovsky made the Passive Investor Misrepresentations and the Personal Misrepresentations, Simanovsky and Senator had no intention of working with Baumann as CEO, or otherwise being a "passive investor." Rather, as was to be plainly and quickly revealed, Simanovsky's  and Senator's short term plan was nothing short of the absolute takeover and control of Trade Street's Board and the complete overhaul of Trade Street's existing management by, among other things, removing Baumann from his positions as CEO and Chairman of the Trade Street Board.

21.     Simanovsky made each of the Passive Investor Misrepresentations and the Personal Misrepresentations in his capacity as an agent of Senator and with the specific purpose of securing a transaction between Trade Street and Senator, to generate a financial benefit for Senator.

- 6 -

*Senator's Misrepresentations Lead to a Transaction with Trade Street*

22.     Following the October Florida Meeting, Trade Street continued discussions with both TPG Capital and Senator about their respective proposals to increase Trade Street's capital.

23.     On October 30, 2013, the Trade Street Board held a "Special Telephonic Meeting" to consider the transactions proposed by TPG Capital and Senator.  Relying on the Passive Investor Misrepresentations and the Personal Misrepresentations, Baumann recommended to the Trade Street Board that Trade Street enter into the Backstop Transaction with Senator.

24.     The Trade Street Board followed Baumann's recommendation to enter into the Backstop Transaction with Senator, rather than a transaction with TPG Capital or another capital source.  Shortly thereafter, Trade Street and Senator entered into a non-solicitation agreement and began preparing the various documents related to the Backstop Transaction.

25.     Had Baumann known that the Passive Investor Misrepresentations and Personal Misrepresentations were not true, Baumann would never have recommended that the Trade Street Board enter the Backstop Transaction with Senator.  Further, had Baumann not recommended the Backstop Transaction, the Trade Street Board never would have approved it.

*The Backstop Transaction*

26.     As originally proposed by Senator, the final, agreed terms of the Backstop Transaction between Senator and Trade Street provided for:

   a. a $100 million rights offering to Trade Street's existing shareholders (the "Guaranteed Offering");

b. a commitment from two funds advised by Senator, Senator Global Opportunity Fund, LP and Senator Global Opportunity Intermediate Fund L.P. (the "Senator Funds"), to purchase the unsubscribed portion of that $100 million rights offering, if any; and

c. a separate, additional purchase of $50 million of Trade Street common shares by the Senator Funds.

27.     As a condition for Senator's participation in the Backstop Transaction, Senator demanded that Baumann personally purchase a substantial number of Trade Street common shares.  Relying on Senator's Passive Investor Misrepresentations and the Personal Misrepresentations, Baumann purchased 120,766 shares of Trade Street common stock for $764,448.78 (the "Management Purchase Agreement").  Pursuant to the terms of the Management Purchase Agreement, the 120,766 shares Baumann purchased are "restricted securities" that cannot be resold without registration under the Securities Act of 1933 (except in certain very limited circumstances) and are subject to the resale limitations it imposes.

28.     As yet another condition for Senator's participation in the Backstop Transaction, Trade Street agreed to pay the Senator Funds a total fee of $7.5 million in unregistered shares of Trade Street common stock, calculated at the Rights Offering Subscription Price.  Additionally, at Senator's request, Trade Street agreed to reimburse the Senator Funds for up to $400,000 of their reasonable costs incurred in connection with the Backstop Transaction.

29.     The Guaranteed Offering commenced on December 18, 2013 and closed on January 16, 2014.

30.     Following the Backstop Transaction, the Senator Funds owned a combined total of 9,316,055 shares of Trade Street common stock, effectively giving

- 8 -

Senator control over 25.5% of Trade Street's outstanding common stock.

31.     The Senator Funds were not the only new investors in Trade Street through the Backstop Transaction.  Adam Sklar, an investment professional at the hedge fund Monarch Alternative Capital LP ("Monarch"), orchestrated a significant investment in Trade Street by a group of funds advised by Monarch (the "Monarch Funds").  Not coincidentally, it turns out, Sklar's childhood friend is none other than Simanovsky.

32.     By January 24, 2014, Sklar had acquired 8,452,678 shares of Trade Street common stock for the Monarch Funds, thereby giving Monarch effective control over a 23.25% ownership interest in Trade Street.

33.     Importantly, the Monarch Funds' ownership stake meant that Simanovsky and his two friends Sklar and Roy (the investment analyst at BHR Capital who first brought Trade Street to Simanovsky's attention) effectively controlled the majority of the outstanding shares of Trade Street common stock.  Specifically, as of January 24, 2014, the Senator Funds owned 25.5%, the Monarch Funds owned 23.25%, and BHR Capital owned approximately 3.58%, cumulatively representing ownership of 52.33% of the outstanding shares of Trade Street.

*Simanovsky Carries Out*
*Senator's Plan to Take Control of Trade Street*

34.     In a document filed with the Securities and Exchange Commission ("SEC") as part of the Backstop Transaction, each of the Senator Funds specifically and expressly represented and warranted that it was acquiring shares of Trade Street common stock "in the ordinary course of its business, and … not with the purpose nor with the effect of changing or influencing the control of [Trade Street], nor in connection

- 9 -

with or as a participant in any transaction having such purpose or effect."

35.     In another SEC filing in connection with the Backstop Transaction, Senator and the Senator Funds expressly agreed not to "seek representation on the Board or a change in the composition of the Board or number of directors elected by the holders of Common Stock or a change in the number of such directors who represent the Investor, other than as expressly permitted" under the terms of the Backstop Transaction.

36.     Nevertheless, the Backstop Transaction did expressly permit Senator to appoint up to two directors to the Trade Street Board.  Baumann was not overly concerned when this provision was negotiated, given the express representations about being a passive investor that Senator and the Senator Funds made in the SEC filings together with the Passive Investor Misrepresentations.

37.     Consistent with these provisions, upon the closing of the Backstop Transaction, Senator appointed Simanovsky as its first representative on the Trade Street Board.

38.     At all times that he was serving on the Trade Street Board, Simanovsky was serving as the appointed representative of Senator and the Senator Funds, and acting for and on behalf of Senator.

39.     Almost immediately after the closing of the Backstop Transaction and being appointed as Senator's first representative on the Trade Street Board, Simanovsky began to insist that Monarch be given an appointment to the Trade Street Board, knowing that the addition of Monarch's Sklar to the board would help Simanovsky and Senator take control.  Baumann repeatedly and vocally opposed

Simanovsky's demands in this regard, but Simanovsky persisted in advocating for Sklar's appointment to the Trade Street Board because he knew adding Sklar to the Trade Street Board was crucial to carry out Senator's agenda.

*The February 2014 Board Meeting: Simanovsky Adds Sklar to the Trade Street Board and Denies Baumann the Compensation Senator Promised*

40.     Less than one month after the closing of the Backstop Transaction, the Trade Street Board held a regular meeting in Aventura, Florida on February 12, 2014.

41.     In preparation for the February board meeting, Simanovsky advised the Trade Street Board on February 5, 2014 that Senator had designated its General Counsel, Evan Gartenlaub, as Senator's second discretionary director appointment. Senator insisted that Trade Street ensure that Gartenlaub's appointment was effective prior to the February board meeting, and Gartenlaub became a director of Trade Street effective on or about February 10, 2014.

42.     Shortly after the February board meeting began, director Lewis Gold announced that he was resigning from the Trade Street Board effective upon conclusion of the meeting.

43.     Not coincidentally, Simanovsky had invited Monarch's Sklar to attend the February board meeting and, immediately upon Gold's resignation from the Trade Street board, Simanovsky moved for appointment of Sklar to the Trade Street Board. Sklar was then elected and fully participated in the proceedings of the February board meeting.  As Simanovsky and Senator had planned, Sklar sided with Simanovsky on every issue presented for discussion or vote at the meeting.

44.     After the election of Sklar, and pursuant to the agenda for the February board meeting, Baumann and Levin presented their 2014 proposal for executive

compensation to the Compensation Committee of the Trade Street Board ("Compensation Committee").  Consistent with the general plans for future executive compensation that Trade Street management had shared with Senator prior to the Backstop Transaction, the proposal provided for appropriate cash bonuses and salary increases to Baumann, Levin, Chief Financial Officer Richard Ross, and Chief Investment Officer Ryan Hanks.

45.    With respect to Baumann, the compensation proposal provided for: (i) an appropriate cash bonus for 2013; (ii) an appropriate increase in base salary for 2014; (iii) an appropriate cash bonus for 2014; and (iv) an appropriate LTIP award of restricted shares of Trade Street common stock for 2014.

46.    As outlined above, Senator's efforts to induce Baumann to support Senator as the source of new capital for Trade Street included Simanovsky's representations that he and Senator would support what was agreed to be an appropriate cash bonus, salary increase and LTIP award to Baumann upon closing of the Backstop Transaction.  Nevertheless, at the February board meeting, Simanovsky not only refused to support the compensation proposal submitted by Trade Street management, he openly encouraged the Compensation Committee to reject any 2013 bonus for Baumann or any increase of Baumann's salary.

47.    As a direct result of Simanovsky's refusal to support the compensation proposed for Baumann in the 2014 compensation plan, the Trade Street Board did not award Baumann a cash bonus or LTIP award for 2013, or increase his salary for 2014.

48.    As was later to be determined, Simanovsky's refusal at the February board meeting to carry through on his and Senator's earlier promise to support the 2014

compensation plan for Baumann was simply part of the plan by Simanovsky and Senator to squeeze Baumann out of Trade Street altogether.  Specifically, Senator knew that Baumann's severance pay was based upon his most recent compensation, and so by successfully denying Baumann a salary increase, cash bonus and LTIP award at the February meeting, Senator knew it would severely limit the severance compensation required to be paid to Baumann in the event of his termination – an event that Senator knew to be imminent.

*Senator Forces Baumann's Resignation*

49.    On February 19, 2014, only one week after the February board meeting, a group of directors led by Simanovsky and Sklar called a Special Meeting of the Trade Street Board for Friday, February 21, 2014.

50.    The following morning, Thursday, February 20, 2014, Simanovsky and Sklar called Baumann and told Baumann that they had called the February 21 Special Meeting to officially remove Baumann from his positions with Trade Street and the Trade Street Board.  Simanovsky and Sklar stated in no uncertain terms that if Baumann did not enter into an agreement to resign from Trade Street by midnight on Sunday, February 23, Baumann would be terminated by Trade Street without cause. Further, Simanovsky told Baumann that because he did not receive an LTIP award or a cash bonus for 2013 at the February 12 meeting, Baumann would get "nothing" if he resisted their effort to force his resignation and was instead terminated without cause.

51.    Baumann had no prior notice that Senator would seek to have him removed from his positions with Trade Street and the Trade Street Board a mere thirty-three days after the closing of the Backstop Transaction and only a week after the first

- 13 -

board meeting attended by Senator's chosen representatives, Simanovsky and Gartenlaub. Indeed, Baumann had relied on the representations by Simanovsky and Senator that:

- Senator would be a "passive investor," and Simanovsky and Senator would both support Trade Street's existing senior management team;

- Senator and the Senator Funds would not "seek … a change in the composition of the Board" beyond what was expressly permitted in the Backstop Transaction; and

- Simanovsky and Senator had no intention of changing Trade Street's existing management or otherwise obtaining control, directly or indirectly, over Trade Street.

52.     When Sklar and Simanovsky called on Thursday, February 20, 2014 demanding Baumann's resignation no later than midnight, Sunday, February 23, 2014, Baumann advised Simanovsky and Sklar that Baumann was hosting an engagement party for his son at his home on the evening of Saturday, February 22. Given this important and unmovable family commitment, and the fact that Baumann was hosting family and friends at his house all weekend, Baumann asked that Simanovsky and Sklar agree to extend the arbitrary deadline for negotiating an agreement. Simanovsky and Sklar refused. Baumann then spent the weekend attempting to negotiate the terms of his separation under the arbitrary time constraints imposed by Simanovsky and Sklar.

53.     Shortly before midnight on Sunday, February 23, 2014, Baumann executed a Separation Agreement. Thus, just over a month after the Backstop Transaction closed, and only eleven days after Simanovsky and Gartenlaub attended their first board meeting as directors, Senator succeeded in forcing Baumann's resignation from Trade Street, thereby securing Senator's control.

54.     The consequences of Senator's fraudulent misrepresentations proved

- 14 -

severe for Baumann.  Had Senator not misrepresented its intentions to Baumann in the Passive Investor Misrepresentations and the Personal Misrepresentations, Baumann would still be Trade Street's CEO and the Chairman of the Trade Street Board.

55.    Further, over the course of the approximately 2.5 years that remained on his employment agreement at the time Simanovsky and Sklar forced his resignation, Baumann would have earned, consistent with both his past compensation and the most recent proposal to the Compensation Committee, *at least* the following compensation: (i) annual base salary of at least $400,000; (ii) cash performance bonuses for 2013-2015 in the aggregate amount of at least $1,050,000; and (iii) 163,014 restricted shares of Trade Street common stock in LTIP stock awards, having an approximate current value of $1,216,084.44.

*Senator Solidifies Control of Trade Street*

56.    After forcing Baumann's resignation, Simanovsky moved quickly—and contrary to the SEC filings—to remove the few remaining directors that had not yet aligned with Simanovsky and Senator.

57.    At Simanovsky's request, directors James Boland and Sergio Rok resigned effective March 13, 2014.  Five days later, and again at Simanovsky's request, David Levin resigned as President of Trade Street and Vice-Chairman of the Trade Street Board.

58.    Accordingly, by March 18, 2014, barely two months after the Backstop Transaction closed, Senator had successfully carried out its plan to take control of Trade Street.  In those two months, Senator orchestrated the removal of Trade Street's CEO, Founder, President and General Counsel, as well as five directors on the Trade

Street Board, including both the Chairman and the Vice-Chairman.

59.     Despite the fact that Senator and the Senator Funds represented, in writing and to the SEC, that they would not "seek representation on the Board or a change in the composition of the Board or number of directors elected by the holders of Common Stock," within weeks of its initial investment, Senator engineered a radical overhaul of the Trade Street Board, reducing the number of directors from nine to only five.   Three of the five – Simanovsky, Senator's General Counsel Gartenlaub, and Simanovsky's childhood friend, Sklar – constituted a majority of the board and, voting together, could and did control all decisions of Trade Street.

60.     Standing alone, the swiftness and ruthlessness with which Senator moved to take control of Trade Street and change the number and composition of its board of directors demonstrates the abject falsity of Senator's Passive Investor Misrepresentations, the Personal Misrepresentations, and the representations within the SEC filings.   Under no circumstances would Baumann—or, for that matter, any other reasonable business operator—have agreed to do business with Simanovsky and Senator had the dire consequences of relying on Senator's representations been known.

61.     All conditions precedent to the commencement and maintenance of this action have been performed, satisfied or otherwise discharged.

62.     Baumann has retained the law firm of Squire Patton Boggs (US) LLP to bring this action and is obligated to pay Squire Patton Boggs (US) LLP a reasonable fee for its services.

## COUNT I: Violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*

63.     Baumann realleges and incorporates herein by reference each and every allegation contained in the above paragraphs 1 through 62, inclusive, as though fully set forth herein.

64.     Simanovsky acted as Senator's employee and agent, with actual and/or apparent authority, at all relevant times, including, but not limited to, with respect to all of Simanovsky's actions and representations described in this Complaint.

65.     Simanovsky made multiple false representations to Baumann, including the Passive Investor Misrepresentations and the Personal Misrepresentations. Simanovsky made each of those misrepresentations for Senator's benefit.

66.     At the time Simanovsky made the Passive Investor Misrepresentations, he knew each of them was not true.  In fact, at the time Simanovsky made the Passive Investor Misrepresentations, Simanovsky and Senator intended to obtain influence and control over Trade Street's Board and to change Trade Street's existing management, including by removing Baumann from his positions as CEO and Chairman of the Board.

67.     At the time Simanovsky made the Personal Misrepresentations, he knew each of them was not true.  In fact, at the time Simanovsky made the Personal Misrepresentations, Simanovsky and Senator intended to obtain influence and control over Trade Street's Board, and then to remove Baumann from his positions as CEO and Chairman of the Trade Street Board.  Further, at the time Simanovsky made the Personal Misrepresentations, Simanovsky and Senator did not intend to support the award of a performance bonus to Baumann or an increase in Baumann's salary upon completion of the Backstop Transaction.   At the time Simanovsky made the Personal

Misrepresentations, Simanovsky and Senator also did not intend to support any LTIP award to Bauman, or to ensure that Baumann received an appropriate amount of income from bonuses and LTIPs, including at least the amount Baumann had received historically at Trade Street.

68.     Senator, by and through the Passive Investor Misrepresentations and the Personal Misrepresentations, committed "unfair" and/or "deceptive acts" "in the conduct of any trade or commerce," as defined in § 501.204(1), Fla. Stat.

69.     The Passive Investor Misrepresentations and the Personal Misrepresentations caused Baumann to: (i) personally recommend to the Trade Street Board that it enter into the Backstop Transaction with Senator and agree to provide Senator with two appointments to the Trade Street Board; and (ii) enter into the Management Purchase Agreement and thereby purchase shares of Trade Street common stock that Baumann is prohibited from selling or transferring for at least six months from the date of purchase.

70.     But for the above actions by Baumann in reasonable reliance upon the Passive Investor Misrepresentations and the Personal Misrepresentations, the Backstop Transaction would have never occurred and Simanovsky and Senator would not have been able to obtain control over the Trade Street Board and force Baumann's resignation.

71.     But for the Passive Investor Misrepresentations and Personal Misrepresentations, Baumann would not have entered into the Management Purchase Agreement, which has deprived Baumann of the use of $764,448.78 of his personal capital due to the restrictions on the sale of the restricted shares of Trade Street Stock

- 18 -

Baumann acquired through the Management Purchase Agreement.

72.     As   a   direct   and   proximate   result   of   the   Passive   Investor Misrepresentations and the Personal Misrepresentations made by Simanovsky and Senator, Baumann has suffered actual damages in an amount to be proven at trial.

73.     Pursuant to Fla. Stat. § 501.211, Baumann is entitled to an award of his actual damages, attorneys' fees and costs.

WHEREFORE, Baumann respectfully requests that this Court enter a final judgment for money damages in his favor, award Baumann his reasonable attorneys' fees and costs, and enter such other relief as this Court deems just and proper.

### COUNT II: Fraudulent Misrepresentation

74.     Baumann realleges and incorporates herein by reference each and every allegation contained in the above paragraphs 1 through 73, inclusive, as though fully set forth herein.

75.     Simanovsky made the Passive Investor Misrepresentations and the Personal Misrepresentations to Baumann.   Simanovsky made each of those misrepresentations for Senator's benefit.

76.     At the time Simanovsky made the Passive Investor Misrepresentations, he knew each of them was not true.  In fact, at the time Simanovsky made the Passive Investor Misrepresentations, Simanovsky and Senator intended to obtain influence and control over Trade Street's Board and to change Trade Street's existing management, including by removing Baumann from his positions as CEO and Chairman of the Board.

77.     At the time Simanovsky made the Personal Misrepresentations, he knew each of them was not true.   In fact, at the time Simanovsky made the Personal

Misrepresentations, Simanovsky and Senator intended to obtain influence and control over Trade Street's Board, and then to remove Baumann from his positions as CEO and Chairman of the Trade Street Board.   Further, at the time Simanovsky made the Personal Misrepresentations, Simanovsky and Senator did not intend to support the award of a performance bonus to Baumann or an increase in Baumann's salary upon completion of the Backstop Transaction.   At the time Simanovsky made the Personal Misrepresentations, Simanovsky and Senator also did not intend to support any LTIP award to Bauman, or to ensure that Baumann received an appropriate amount of income from bonuses and LTIPs, including at least the amount Baumann had received historically at Trade Street.

78.     Simanovsky intended to induce Baumann to rely upon the Passive Investor Misrepresentations and the Personal Representations for the benefit of Senator.

79.     Baumann justifiably relied upon the Passive Investor Misrepresentations and the Personal Misrepresentations.

80.     In reliance upon Simanovsky's Passive Investor Misrepresentations and the Personal Misrepresentations, Baumann: (i) personally recommended to the Trade Street Board that it enter into the Backstop Transaction with Senator and agree to provide Senator with two appointments to the Trade Street Board; and (ii) entered into the Management Purchase Agreement and thereby purchased shares of Trade Street common stock that Baumann is prohibited from selling or transferring for at least six months from the date of purchase.

81.     But for the Passive Investor Misrepresentations and Personal

- 20 -

Misrepresentations, Baumann would not have entered into the Management Purchase Agreement, which has deprived Baumann of the use of $764,448.78 of his personal capital due to the restrictions on the sale of the restricted shares of Trade Street Stock Baumann acquired through the Management Purchase Agreement.

82.     But for the Passive Investor Misrepresentations and Personal Misrepresentations, Baumann would not have personally recommended to the Trade Street Board that it enter into the Backstop Transaction with Senator.

83.     But for the above actions by Baumann in reasonable reliance upon the Passive Investor Misrepresentations and the Personal Misrepresentations, the Backstop Transaction would have never occurred and Simanovsky and Senator would not have been able to obtain control over the Trade Street Board and force Baumann's resignation.

84.     As a direct and proximate result of the Passive Investor Misrepresentations and the Personal Misrepresentations made by Simanovsky and Senator, Baumann has suffered actual damages in an amount to be proven at trial.

WHEREFORE, Baumann respectfully requests that this Court enter a final judgment for money damages in his favor, award Baumann his reasonable costs, and enter such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable raised in this action.

DATED:  July 16, 2014

Respectfully submitted,

Squire Patton Boggs (US) LLP
200 South Biscayne Boulevard, Suite 4100
Miami, FL  33131
Telephone: +1 305 577 7000
Facsimile:  +1 305 577 7001
Counsel for Plaintiff

By: /s/ Daniel C. Mazanec
John B.T. Murray, Jr.
Florida Bar No. 962759
JB.Murray@squirepb.com
Daniel C. Mazanec
Florida Bar No. 88737
daniel.mazanec@squirepb.com

- 22 -

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 16, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

/s/ Daniel C. Mazanec
Daniel C. Mazanec

4299250/2/MIAMI